**Willie Mae LOCKETT, et al, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 88–CV–71870–DT.**

United States District Court, E.D. Michigan, S.D.

June 20, 1989.

---

**849**

Donnelly W. Hadden, Detroit, Mich., for plaintiffs.

Geneva Halliday, Asst. U.S. Atty., Detroit, Mich., and Jay Tidmarsh, Torts Branch, U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

ZATKOFF, District Judge.

This action involves a claim under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2674. Plaintiffs are 17 individuals who live in Detroit, Michigan, near an environmental pollution site (Carter site) upon which Carter Industrials, Inc. conducted business. Plaintiffs allege the United States Environmental Protection Agency (EPA) failed to warn them about and protect them from polychlorinated biphenyls (PCB) emanating from the Carter site.

Currently before the Court is defendant's motion for summary judgment. Summary judgment is appropriate where no genuine issue of material fact remains to be decided and the moving party is entitled to judg-

ment as a matter of law. *Blakeman v. Mead Containers,* 779 F.2d 1146 (6th Cir. 1985); Fed.R.Civ.P. 56(c). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986). In applying this standard, the Court must view all materials offered in support of a motion for summary judgment, as well as all pleadings, depositions, answers to interrogatories, and admissions properly on file in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *United States v. Diebold,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Cook v. Providence Hosp.,* 820 F.2d 176, 179 (6th Cir.1987); *Smith v. Hudson,* 600 F.2d 60 (6th Cir.1979), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). In deciding a motion for summary judgment, the Court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512. Although summary judgment is disfavored, this motion may be granted when the trial would merely result in delay and unneeded expense. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *A.I. Root Co. v. Computer/Dynamics, Inc.,* 806 F.2d 673, 675 (6th Cir. 1986). Where the non-moving party has failed to present evidence on an essential element of their case, they have failed to meet their burden and all other factual disputes are irrelevant and thus summary judgment is appropriate. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply

show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

## FACTS

Carter Industrials leased land known as the Carter site from 1971 until 1986. Carter Industrials used the land as a scrap yard in conjunction with the operation of its scrap reclamation business. Throughout its existence, Carter Industrials salvaged copper coils from scrap transformers which, at some point, contained PCB concentrated oil.

In Michigan, EPA inspections authorized under the Toxic Substance Control Act (TSCA), 15 U.S.C. § 2601 *et seq.*, § 2610, are performed by the Michigan Department of Natural Resources (MDNR) pursuant to a grant agreement. Certain MDNR employees receive EPA training and credentials. The MDNR is required to conduct between 140 to 230 inspections each year. The number of sites subject to inspection greatly exceeds 230. Accordingly, MDNR inspectors randomly inspect sites for inspection from a list of possible PCB users. Additional inspections occur if required by crisis, if prior inspection reveals a potential TSCA violation warranting re-inspection, or as a result of citizen complaints. The EPA does not exercise daily control over MDNR inspections, but retains authority to render decisions regarding enforcement action arising as a result of inspections.

In March, 1981, Dan Schultz of the MDNR inspected the Carter site. Mr. Schultz was not an authorized EPA inspector pursuant to the grant agreement. Mr. Schultz extracted laboratory samples from electronic transformers located on the site. Test results indicated no PCB in the transformers. An additional lab sample was drawn from the soil under an oil puddle. The soil sample revealed 560 parts per million (ppm) of PCB emanating from the ground.

As a general rule, the EPA maintains an action level of 50 ppm of PCB. (An action level is the level at which PCB found in the soil is considered too high). Although the 1981 sample indicated a level in excess of the action level, no action was taken at the Carter site because there was no evidence the contamination occurred after 1979, the effective date of rules promulgated pursuant to TSCA. There was no evidence that PCB-containing products were on the site, nor was there any evidence the PCB materials were recently placed on the site. Defendant's Exhibit 1, p. 3; Defendant's Exhibit 3, pp. 15–19; 32.

In July, 1984, an inspection of the Carter site was conducted pursuant to a request by the Detroit Fire Department. An MDNR inspector with EPA credentials conducted the inspection. The inspector noted Carter's records indicated it received no product containing oil with greater than 50 ppm concentration of PCB. The inspector's visual inspection confirmed Carter's records. Although there were some scrap transformers on site which were labeled to have contained between 50 ppm and 500 ppm PCB, these transformers contained no oil at the time of the inspection and the visual inspection revealed no evidence the transformers were drained on the Carter site.

The inspector drew five lab samples for analysis. One sample was fluid drawn from a transformer, two samples were drawn of soil near stock piles of scrap transformers, one sample was drawn from the main office driveway and one sample was drawn from an alley off of the Carter site.

The laboratory sample drawn from the transformer indicated no PCB. The two samples of soil drawn from near the scrapped transformers revealed PCB levels of 31 ppm and 167 ppm. The driveway sample tested at 131 ppm and the off-site sample revealed a PCB level of 2430 ppm.

At the time these results were reported, Daniel Patulski was the EPA Project Officer responsible for the administration of TSCA in Michigan. Mr. Patulski determined that because no regulated equipment or sources were found or reported on the site, there was insufficient evidence to support a finding of TSCA violations. Patulski Aff. para. 16. Mr. Patulski concluded, however, that further sampling and inspec-

tion was warranted to determine the sources of PCB and the approximate dates of contamination. *Id.* para. 17. As a result, the MDNR was instructed to place Carter Industrials on its re-inspection list. Id. para. 18.

The re-inspection of the Carter site was not made a priority matter. Rather, based upon EPA inspections of certain waste-oil hauling companies, the MDNR was instructed to give priority to inspection of waste-oil haulers. *Id.* para. 19. Re-inspection of the Carter site was considered but rejected in the winter of 1985–86 due to snow cover of the ground that likely would have prevented effective laboratory samples.

On May 14, 1986, the MDNR performed a re-inspection of the Carter site. This inspection revealed, for the first time, that Carter was regularly handling equipment containing PCB oil greater than 50 ppm. Laboratory samples disclosed off-site contamination of up to 90,000 ppm of PCB. Pursuant to the remedial powers granted in the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, an immediate clean-up commenced and neighborhood advisories were issued. Subsequent investigation revealed Carter Industrials regularly had been purchasing scrap transformers from the City of Detroit commencing in approximately 1975. Most of the transformers obtained from the city of Detroit had contained PCB concentrated oil.

### LAW

Plaintiffs assert a FTCA claim, 28 U.S.C. § 1346(b). FTCA holds the United States to the same common law liability standard as applied to private entities or persons. Thus, in order to prevail on a FTCA claim, plaintiffs must establish the existence of a tort claim viable under the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). There exists one exception to FTCA liability—no liability shall attach to the government when the alleged wrongful conduct arises out of the execu-

tion of a discretionary function. 28 U.S.C. § 2680(a).

Defendant submits plaintiffs' claim must be dismissed because the EPA's conduct falls within the discretionary function exception to FTCA liability.

Section 2680(a) precludes liability for claims arising from "the exercise or performance or failure to exercise or perform a discretionary function or duty ... whether or not the discretion involved be abused." To determine whether conduct is discretionary, a court must consider the nature and quality of the conduct involved. *United States v. S.A. Empresa De Viacao Aerea Rio Grandense*, 467 U.S. 797, 2755, 81 L.Ed.2d 660 (1984). *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *Boyle v. United Technologies Corp.*, 486 U.S. ——, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). The nature and quality of the conduct is determined by applying a two-step analysis. First, a court must "consider whether the action is a matter of choice for the acting employee...." *Berkovitz*, 108 S.Ct. at 1958. Discretionary conduct always "involves an element of judgment or choice." *Id.* Second, assuming the conduct in question involves an element of choice or judgment, the court must consider whether the judgment exercised is of the type the discretionary function exception is designed to protect. *Berkovitz*, 108 S.Ct. at 1959.

Applying the two-prong *Berkovitz* test to this case, the Court finds the EPA's conduct involved a matter of choice. The conduct which plaintiffs attack is the EPA's failure to warn and protect them from the hazardous substances found on the Carter site. In TSCA, Congress gave the EPA broad discretion to determine whether and how to protect and warn the public.

The purpose of TSCA is to monitor and review potentially hazardous chemicals and to regulate chemicals that present unreasonable risks to the environment and people. 15 U.S.C. § 2601(b). To accomplish this purpose, Congress gave the EPA authority "to take action with respect to chemical substances and mixtures which

are imminent hazards." *Id.* Congress gave the EPA great deference in accomplishing its goals requiring only that the EPA carry out the purposes of TSCA in a reasonable and prudent manner. 15 U.S.C. § 2601(c). Congress intended that the EPA consider all the environmental, economic and social concerns before taking action under TSCA. *Id.*

TSCA gives the EPA authority to promulgate rules for the manufacture, use and disposal of PCB. Most rules promulgated pursuant to TSCA preempt state and local law regulating PCB. 15 U.S.C. § 2617(a)(2) and (b). TSCA also gives the EPA or its duly authorized representative the authority to inspect facilities associated with the manufacture, storage or processing of regulated chemical substances to ensure compliance with the Act. 15 U.S.C. § 2610. The method of conducting PCB inspections and protecting the public are not defined within the Act or regulations promulgated thereunder.

Plaintiffs allege a claim arising out of the failure to warn and protect them from an environmental hazard created by Carter Industrials, a third party. Congress, through TSCA, CERCLA and the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 *et seq.,* provided the EPA with broad discretion to determine when and how to protect the public. Plaintiffs admit the EPA's conduct did not contravene any statute or regulation. The EPA's decisions regarding when and how to investigate and act against Carter Industries were "matters of choice" within the meaning of *Berkovitz,* 108 S.Ct. at 1958.

Having reached the above determination, the Court must consider whether the judgment exercised in making the determinations regarding the method and manner of investigating Carter Industries is the type of decision the discretionary function exception is designed to protect. The purpose for the discretionary function exception is succinctly set forth in *Berkovitz,* 108 S.Ct. at 1959:

The basis for the discretionary function exception was Congress' desire to "prevent judicial 'second-guessing' of legisla-

tive and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines,* [467 U.S. 797] ... 104 S.Ct. [2755] at 2764–2765 [81 L.Ed.2d 660 1984] The exception, properly construed, therefore, protects only governmental actions and decisions based on considerations of public policy.

Plaintiffs' complaint attacks the EPA's manner of determining when and how to investigate and its method of operation for carrying out the TSCA program. The EPA established a method of random investigation with limited follow-up inspections for sites with some recorded contamination. As administrator of the Michigan TSCA program, Daniel Patulski had authority and was under a duty to take into account certain EPA policy considerations such as the resources available for PCB re-inspections, the amount of evidence, or lack thereof, to support an enforcement action, and the allocation of the EPA's limited resources for making re-inspections "priority" matters before deciding upon a course of action. Before implementing an enforcement action, the EPA must consider the available budget in conjunction with the known hazards and risks to public health.

In this instance, Daniel Patulski weighed the evidence of contamination—the 1984 sample indicating extremely high levels of PCB off the the Carter site—in conjunction with the lack of evidence to support an enforcement action—no evidence of PCB products on site—against the constraints of available resources. In exercising his judgment and discretion, Mr. Patulski determined that an enforcement action was not warranted in either 1981 or 1984. Mr. Patulski further determined the 1984 inspection of the Carter site warranted re-inspection, but that the most efficient use of EPA resources required that the re-inspection not take priority over inspections of waste-oil hauling companies. These administrative determinations are grounded in social, economic and political policy and are thus the type of decisions the discretionary function exception is designed to protect.

Numerous courts from other jurisdictions have, pursuant to § 2680(a), dismissed similar claims. In *Cisco v. United States*, 768 F.2d 788 (7th Cir.1985) plaintiffs sued the EPA for failing to warn plaintiffs their residential landfill was contaminated with dioxin, failing to remove the contaminated earth and failing to protect plaintiffs from contamination. The Seventh Circuit dismissed the case, noting:

> Congress has left to the EPA to decide the manner in which, and the extent to which, it will protect individuals and their property from exposure to hazardous wastes.... In deciding not to warn Cisco about the contaminated landfill, the EPA made political, social and economic judgments pursuant to its grant of authority.

*Cisco*, 768 F.2d at 789–90.

Similarly, in *Wells v. United States*, 851 F.2d 1471 (D.C.Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989), plaintiffs sued the EPA for failing to warn and protect them of risks of chemical contamination emanating from a nearby lead factory. There was evidence the EPA was aware of the contamination. Rather than acting immediately, the EPA chose to study the problem. Finding the decision to study the problem was based upon such policy considerations as budgetary constraints, likelihood of a successful enforcement action and available resources, the D.C. Circuit found the decision to be protected by § 2680(a).

Similar results have been reached in *K.W. Thompson Tool Co., Inc. v. United States*, 836 F.2d 721 (1st Cir.1988); *USF & G v. United States*, 837 F.2d 116 (3rd Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 2902, 101 L.Ed.2d 935 (1988); *Bacon v. United States*, 810 F.2d 827 (8th Cir.1987); *Pennbank v. United States*, 779 F.2d 175 (3rd Cir.1985). Like the case at bar, all of these cases challenge the exercise of policy judgment.

## CONCLUSION

For the reasons stated herein, the Court finds plaintiffs' claim barred by the provisions of 28 U.S.C. § 2680(a). Accordingly, defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED.