Willie Mae LOCKETT, George R. Jackson, Thelma Y. Jackson, Nathaniel Johnson, Sylvester McQueen, Dorothy L. McQueen, Linnon Nixon, Edith Nixon, Ada Partlow, Luther Wiggins, Ira L. Wilson, Kevin L. Carter, Joanne Davis, Cynthia Davis, Ronald Davis, Henry Dillard, Lucy Bell Dillard, Albert Nicholson, Annie J. Torry, and Charles White, Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee.

No. 89–1768.

United States Court of Appeals, Sixth Circuit.

Argued March 13, 1991.

Decided July 3, 1991.

Donnelly W. Hadden (argued), Donnelly W. Hadden, P.C., Detroit, Mich., for plaintiffs-appellants.

Geneva S. Halliday, Asst. U.S. Atty., Detroit, Mich., Sally M. Rider (argued), U.S. Dept. of Justice, Torts Branch Civ. Div., Washington, D.C., for defendant-appellee.

Before RYAN, Circuit Judge, and EDWARDS and WELLFORD *, Senior Circuit Judges.

---

* The Honorable Harry W. Wellford assumed senior status on January 21, 1991.

RYAN, Circuit Judge.

This is an appeal from the dismissal of an action brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, alleging negligence by the Environmental Protection Agency ("EPA") in its handling of a scrap yard site contaminated with polychlorinated biphenyls ("PCBs" or "PCB"). The district court granted the government's motion for summary judgment and dismissed the suit pursuant to 28 U.S.C. § 2680(a), the discretionary function exception to the FTCA. *Lockett v. United States*, 714 F.Supp. 848 (E.D.Mich.1989). Plaintiffs appeal, claiming the discretionary function exception is not available to the government on the facts of this case. We disagree, and affirm the district court's judgment of dismissal.

## I.

Plaintiffs are twenty people who lived near a scrap yard used by Carter Industrial, Inc. in Detroit, Michigan. Carter was engaged in scrap reclamation, and had stockpiled a number of old electrical transformers on its property. Dielectric fluid within such transformers often contains high concentrations of PCBs, which are carcinogenic chemicals subject to federal regulation pursuant to the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601, *et seq.* *See* 15 U.S.C. § 2605(e).

The PCB regulations issued by the EPA pursuant to TSCA require marking and disposal of PCBs and PCB contaminated products in "concentrations of 50 parts per million (ppm) and above." 40 C.F.R. § 761.1 *et seq.* (1990). Ordinarily there is no requirement that any action be taken when the concentration is below 50 ppm.

In March 1981, the EPA first learned that the Carter site had detectable levels of PCBs. At that time, Dan Schultz, a Michigan Department of Natural Resources ("MDNR") inspector found 560 ppm of PCB in an oil puddle on the property. By a grant agreement, MDNR inspectors act on the EPA's behalf. They inspect sites randomly selected from lists of possible PCB handlers or act in response to a citizen request. Plaintiffs do not question the va-

lidity of the inspection arrangement between EPA and MDNR, nor do they contest the adequacy of any MDNR actions. Schultz was not approved by the EPA under its agreement with MDNR, and had gone to the Carter site in response to an anonymous tip regarding transformers and oil stains on the property. He found no PCBs in two fluid samples taken from the old transformers. The EPA was notified of this inspection, but took no action against Carter at that time because it concluded that there was "insufficient evidence that any PCBs had been recently placed into the ground or that any regulated PCBs or PCB-contaminated equipment existed on-site."

On July 6, 1984, MDNR Inspector Margaret Fields conducted tests at the Carter site revealing the presence of PCBs. Ms. Fields was approved by the EPA pursuant to the EPA/MDNR agreement, and visited the Carter site at the request of the Detroit Fire Department after a fire on the premises. The 1984 tests revealed that, while fluid in one of the transformers on the property contained no PCBs, two soil samples near some scrapped transformers had PCB readings of 31 and 167 ppm, a sample from the main office driveway read 131 ppm, and soil from an alley just off the Carter site showed PCBs at 2,340 ppm. Daniel Patulski, then EPA's Project Officer for the State of Michigan, was notified of these findings. He thought there was insufficient evidence to charge Carter with a TSCA violation because the MDNR inspector's visual inspection of the Carter site confirmed Carter's records that Carter was then handling no oil with PCB concentrations exceeding 50 ppm. Patulski determined, however, that further monitoring of the Carter site was required to determine the sources of the PCBs and dates of contamination.

MDNR personnel again inspected the Carter site on May 14, 1986. They learned that Carter was handling PCB-contaminated equipment and found high levels of PCB-contaminated oil and equipment in concentrations as high as 90,000 ppm. As a result of its discovery, the EPA issued

advisory notices to the local media and to neighbors living near the scrap yard, and initiated an emergency cleanup of the contaminated area. As a result, the plaintiffs learned, for the first time, of the PCB contamination.

Plaintiffs filed suit against the government under FTCA on May 2, 1988, alleging that the EPA was negligent in failing to warn them of the dangers associated with the Carter site and in failing to exercise reasonable care to prevent or at least decrease the risks from continued exposure to PCBs after March 1981.

In March of 1989, the government moved for summary judgment, in part, pursuant to 28 U.S.C. § 2680(a), which shields the government from liability under FTCA for the conduct of its agents in exercising certain discretionary functions. The district court determined that the discretionary function exception to FTCA was indeed applicable on the facts of this case and, therefore, the court was without jurisdiction to entertain the plaintiffs' claims. The court said:

EPA's conduct involved a matter of choice. The conduct which plaintiffs attack is the EPA's failure to warn and protect them from the hazardous substances found on the Carter site. In TSCA, Congress gave the EPA broad discretion to determine whether and how to protect and warn the public.

And:

In this instance, Daniel Patulski weighed the evidence of contamination— the 1984 sample indicating extremely high levels of PCB off the Carter site—in conjunction with the lack of evidence to support an enforcement action—no evidence of PCB products on site—against the constraints of available resources. In exercising his judgment and discretion, Mr. Patulski determined that an enforcement action was not warranted in either 1981 or 1984. Mr. Patulski further determined the 1984 inspection of the Carter site warranted re-inspection, but that the most efficient use of EPA

resources required that the re-inspection not take priority over inspections of waste-oil hauling companies. These administrative determinations are grounded in social, economic and political policy and are thus the type of decisions the discretionary function exception is designed to protect.

714 F.Supp. at 851–52.

The court, therefore, granted the government's motion for summary judgment. Plaintiffs appeal from that decision.

## II.

We review dismissals on the basis of summary judgment *de novo*. *Burkart v. Post–Browning, Inc.*, 859 F.2d 1245, 1249 (6th Cir.1988). Under Fed.R.Civ.P. 56(c), our duty is to determine whether, viewing the evidence in a light most favorable to plaintiffs, there is a genuine issue as to any material fact precluding the government from a judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

## A.

The Federal Tort Claims Act is a broad waiver by Congress of the United States' immunity from actions based on the tortious conduct of federal employees. However, the government is not subject to tort liability for

[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). Interpretations of this "discretionary function" exception by the Supreme Court have not been entirely consistent,[1] but the Court's most recent deci-

---

1. *Compare Dalehite v. United States,* 346 U.S. 15, 35, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953), in

which the Supreme Court held that the discretionary function exception barred FTCA claims

sion on section 2680(a) is helpfully clarifying and provides a workable means of applying it. *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

*Berkovitz* involved an FTCA suit by the parents of a minor who contracted crippling polio after ingesting a defective dosage of Orimune, a polio vaccine. Plaintiffs alleged, first, that the government, through what was in 1979 a division of the National Institutes of Health, wrongfully licensed a drug manufacturer to produce the Orimune and, second, that the government, through the Food and Drug Administration, wrongfully approved public release of the lot of Orimune containing the dose the Berkovitz child ingested.

The district court denied the government's subsequent 28 U.S.C. § 2680(a)-inspired motion to dismiss the case for lack of subject matter jurisdiction, but the Court of Appeals for the Third Circuit reversed. The Supreme Court then granted certiorari to determine "whether the discretionary function exception of the Federal Tort Claims Act ... bars a suit based on the Government's licensing of an oral polio vaccine and on its subsequent approval of the release of a specific lot of that vaccine to the public." *Id.* at 533, 108 S.Ct. at 1957. The Court held, "the Court of Appeals erred in holding that the discretionary function exception required the dismissal of petitioners' claims respecting the licensing of Orimune and the release of a particular vaccine lot." *Id.* at 548, 108 S.Ct. at 1965.

In so ruling, the Supreme Court set forth a two-pronged test to be applied to FTCA cases in which the government asserts a 28 U.S.C. § 2680(a) defense:

In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice. Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.

Moreover, assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield. The basis for the discretionary function exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy. In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment.

arising from the explosion of ammonium nitrate fertilizer being produced and distributed as part of the United States' post-World War II efforts to aid devastated areas in Europe, *and United States v. Varig Airlines*, 467 U.S. 797, 821, 104 S.Ct. 2755, 2768, 81 L.Ed.2d 660 (1984), in which the Court held that the government was immune from liability under FTCA in separate actions for personal and property damage allegedly stemming from the Federal Aviation Administration's negligent failure to inspect the design of two aircraft before certifying their airworthiness under the discretionary function exception, *with Indian Towing Co. v. United*

*States*, 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955), in which the Court held that the government could face FTCA liability for damages sustained as the result of the Coast Guard's alleged negligent maintenance of a lighthouse, *and Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), discussed above. These cases support one jurist's lament that the law regarding the discretionary function exception looks more like a patchwork quilt than a seamless web. *Blessing v. United States*, 447 F.Supp. 1160, 1167 (E.D.Pa.1978), *as quoted in Dube v. Pittsburgh Corning*, 870 F.2d 790, 796 (1st Cir.1989).

*Id.* at 536–37, 108 S.Ct. at 1958–59 (citations omitted).

Consequently, in this case, we must examine the statutory and regulatory scheme outlining the EPA's obligations with regard to the cleanup of PCBs. We must first determine whether the scheme prescribed a specific and mandatory course of conduct for EPA when it learned that the site tests showed the presence of PCBs in excess of 50 ppm or whether the agency had some discretion to formulate a response in the circumstances. If it is the latter, we must then determine whether the discretionary decision involved in the challenged action, or, in this case, inaction, is the kind of discretionary judgment—one rooted in social, economic, or political policy—that Congress intended would be shielded from liability.

### B.

Plaintiffs argue that in March 1981, when the EPA became aware that the MDNR inspector found an oil puddle on the Carter site that contained PCBs at 560 ppm, that the agency had a mandatory duty to warn plaintiffs of the situation, to inspect further, and to clean up the site. The agency had a duty to do so again in July 1984, when the MDNR inspector's PCB readings on and near the Carter site were 31, 167, 131, and 2,340 ppm. Plaintiffs base this argument on the claim that TSCA, specifically 15 U.S.C. § 2605(e), and the regulations promulgated thereunder, *see* Polychlorinated Biphenyls, 40 C.F.R. § 761.1, *et seq.* (1990), which preempt state regulatory authority, dictate a specific, mandatory, and nondiscretionary response by the EPA, such as public warning or cleanup, when it learns that any part of a site contains PCBs in excess of 50 ppm. Plaintiffs find additional support for their argument in an EPA statement made in the Preamble to Polychlorinated Biphenyls Spill Cleanup Policy, 52 Fed.Reg. 10,688 (1987) [hereinafter Spill Cleanup] (citing Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce and Use Prohibitions; Use in Electrical Equipment, 47 Fed.Reg. 37,342 (1982) [hereinafter Use in Electrical Equipment] ), and documents issued by the regional EPA office for the State of Michigan.

The TSCA is a lengthy statute authorizing the EPA to regulate toxins generally, and PCBs specifically. In its policy statement, the Act states:

(1) adequate data should be developed with respect to the effect of chemical substances and mixtures on health and the environment....

(2) adequate authority should exist to regulate chemical substances and mixtures which present an unreasonable risk of injury to health or the environment, and to take action with respect to chemical substances and mixtures which are imminent hazards; and

(3) authority over chemical substances and mixtures should be exercised in such a manner as not to impede unduly or create unnecessary economic barriers to technological innovation while fulfilling the primary purpose of this chapter to assure that such innovation and commerce in such chemical substances and mixtures do not present an unreasonable risk of injury to health or the environment.

15 U.S.C. § 2601(b). Further, the Act reads:

It is the intent of Congress that the Administrator [of EPA] shall carry out this chapter in a reasonable and prudent manner, and that the Administrator shall consider the environmental, economic, and social impact of any action the Administrator takes or proposes to take under this chapter.

15 U.S.C. § 2601(c). 15 U.S.C. § 2606(a) provides the EPA "may" file a civil suit to seize imminently hazardous chemicals or otherwise seek relief therefrom. Such relief "may" include:

the issuance of a mandatory order requiring (A) in the case of purchasers of such substance, mixture, or article known to the defendant, notification to such purchasers of the risk associated with it; (B) public notice of such risk; (C) recall; (D) the replacement or repurchase of such substance, mixture, or article; or

(E) any combination of the actions described in the preceding clauses.

15 U.S.C. § 2606(b)(2).[2]

In addition to these general criteria, TSCA specifically authorizes regulation of PCBs. *See* 15 U.S.C. § 2605(e). Congress added this provision to TSCA because of its concern for the significant health and environmental dangers associated with PCBs.[3]

Pursuant to TSCA, the EPA promulgated regulations regarding the manufacture, processing, distribution, and use of PCB-contaminated materials. *See* Polychlorinated Biphenyls, 40 C.F.R. § 761.1 *et seq.* (1989). An understanding of the evolution of these regulations since 1978 is important to an understanding of our decision.

Initially, the PCB regulations, which apply to manufacturers, processors, distributors, and users of materials containing PCBs, used 500 ppm as a regulatory benchmark. *See, e.g.,* 40 C.F.R. § 761.10(e) (1978). In 1979, the EPA lowered the 500 ppm minimum to 50 ppm, *see* Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions, 44 Fed.Reg. 31,514, 31,516 (1979), as a means of generally defining

when the PCB regulations applied. *See* 40 C.F.R. § 761.1(b) (1979). In 1984, as part of its response to *Environmental Defense Fund, Inc. v. Environmental Protection Agency,* 636 F.2d 1267, 1280 (D.C.Cir.1980), which held that substantial evidence did not support the EPA's decision to limit the application of its PCB regulations to materials with concentrations of 50 ppm or higher, the EPA narrowed its reference to 50 ppm as a means of categorizing certain disposal and storage procedures. *See* Toxic Substances Control Act; Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce and Use Prohibitions; Response to Individual and Class Petitions for Exemptions, 49 Fed.Reg. 28,154, 28,189 (1984) (as codified at 40 C.F.R. § 761.1(b) (1985)). Since 1979, the EPA has imposed record keeping and reporting requirements upon PCB handlers. *See* 40 C.F.R. §§ 761.180–761.193 (1990). In 1987, the EPA also promulgated detailed regulations outlining cleanup procedures for spills releasing PCBs in excess of 50 ppm. *See* Spill Cleanup, 52 Fed.Reg. 10,688 (as codified at 40 C.F.R. §§ 761.120–761.135 (1988)).[4]

2. Additional provisions worth noting include 15 U.S.C. §§ 2603 and 2605, which require the Administrator of EPA to test and categorize chemical substances and issue regulations as to those found hazardous. 15 U.S.C. § 2607 requires chemical manufacturers to comply with EPA's reporting requirements. 15 U.S.C. § 2610 permits the EPA to inspect sites as necessary to enforce TSCA and regulations promulgated thereunder.

3. For a concise discussion of the legislative history of 15 U.S.C. § 2605(e), *see Environmental Defense Fund, Inc. v. Environmental Protection Agency,* 636 F.2d 1267, 1271–72 (D.C.Cir.1980).

4. The EPA's current PCB spill cleanup policy, which applies only to spills occurring after May 4, 1987, *see* 40 C.F.R. § 761.120(a) (1990), is to evaluate the adequacy of cleanup efforts by the party who caused the contamination on the basis of site-specific considerations, *see* 40 C.F.R. §§ 761.120(b) and (c), timeliness of the reporting; 40 C.F.R. § 761.125(a)(1), disposal method used; 40 C.F.R. § 761.125(a)(2), and success at meeting EPA's numerical cleanup goals for the type of spill involved. *See* 40 C.F.R. §§ 761.125(b) and (c). It is worth noting that even with this precise policy, the EPA views its enforcement obligations as discretionary:

(a) Although a spill of material containing 50 ppm or greater PCBs is considered improper PCB disposal, this policy establishes requirements that EPA considers to be adequate cleanup of the spilled PCBs. Cleanup in accordance with this policy means compliance with the procedural as well as the numerical requirements of this policy. Compliance with this policy creates a presumption against both enforcement action for penalties and the need for further cleanup under TSCA. The Agency reserves the right, however, to initiate appropriate action to compel cleanup where, upon review of the records of cleanup or EPA sampling following cleanup, EPA finds that the decontamination levels in the policy have not been achieved. The Agency also reserves the right to seek penalties where the Agency believes that the responsible party has not made a good faith effort to comply with all provisions of this policy, such as prompt notification of EPA of a spill, recordkeeping, etc.

(b) EPA's exercise of enforcement discretion does not preclude enforcement action under other provisions of TSCA or any other Federal statute. This includes, even in cases where the numerical decontamination levels set forth in this policy have been met, civil or criminal action for penalties where EPA be-

In addition to citing the foregoing statutory and regulatory scheme, plaintiffs invite our attention to a statement made by the EPA in the background discussion of its introduction to the PCB spill cleanup policy. As part of an explanation of its authority to issue such regulations, the EPA stated:

> For PCB spill cleanup, EPA has already in place certain requirements for timely cleanup. In the final PCB Electrical Equipment Rule published in the Federal Register of August 25, 1982 (47 FR 37342), EPA requires the initiation of PCB Transformer spill cleanup within 48 hours of spill discovery and defines disposal specifically to include leaks, spills, and other unintentional discharges of PCBs.

Preamble to Spill Cleanup, 52 Fed.Reg. at 10,688. Plaintiffs also cite two regional EPA documents regarding spill cleanup procedures that existed in Michigan prior to 1987.

The "Toxic Substances Control Act Manual" ("the Manual") plaintiffs cite reviews TSCA in its first volume. The Manual's second volume describes the EPA's inspection procedures as "intended to detect marking, storage, and use violations while ensuring the accuracy of PCB records and the proper disposal of PCBs and PCB items." [5] In summary form, the Manual then juxtaposes paraphrased descriptions of the regulations with specified procedures to ensure the thoroughness of the inspections the EPA or its delegates conduct.

An October 23, 1985, "Region V PCB Cleanup and Disposal Policy Draft Order" plaintiffs cite "establishes Region V policy under [TSCA] ... with respect to cleanup and disposal activities ... when conducted by either [EPA,] ... Region V, or by private parties pursuant to agreement with [EPA]...." The Draft Order poignantly states that "[a]ll improperly disposed PCBs shall be cleaned up." The Draft Order then sets a cleanup goal of 2.5 ppm, or 1 ppm if the site is a "high contact area," for soil at sites cleaned up, and it directs disposal of the removed materials pursuant to the PCB regulations. The Draft Order states that "[t]he Regional Administrator is responsible for assuring this policy is implemented."

▮ Based on our review of TSCA's provisions, the regulatory scheme the EPA promulgated thereunder, EPA's statements, and the regional documents cited by plaintiffs, we cannot conclude that the EPA was required to undertake a specific and mandatory course of conduct, such as warning the plaintiffs or engaging in immediate cleanup efforts, when it learned of the 1981 and/or 1984 test results regarding the Carter site.

As noted, TSCA was enacted with the Congressional intent that the EPA be permitted to "carry out this chapter in a reasonable and prudent manner and ... consider the environmental, economic, and social impact of any action" it takes or intends to take. *See* 15 U.S.C. § 2601(c). The fact that Congress set PCBs apart by specifically authorizing their regulation in

---

lieves the spill to have been the result of gross negligence or knowing violation.
40 C.F.R. § 761.135 (1990).

**5.** The Manual states in its most pertinent part:
*General Inspection Activities.* Inspectors will be alert for marking, storage, and disposal violations. Suspected violations will be documented by physical samples, photographs, and/or other means as appropriate.
From a records and physical assessment at the facility, inspectors will collect data for reports on the PCB equipment population. The data include total number and type of PCB equipment at the facility, the stated quantities of PCBs in each, and other information as required.

*Records Assessment.* The inspector will examine the facility's PCB records. Records of PCB type and quantity on site and disposition of PCBs will be of primary interest. The inspector will evaluate the records for compliance, accuracy, and completeness. Any suspicious entries, or any missing data, will be explored further.
*Physical Assessment.* A portion of the PCB inventory will be verified by a physical check. Using the inventory of PCB equipment shown in the records, the inspector will select and then physically inspect a certain number of transformers and/or large capacitors, depending upon the type of inspection being undertaken.

15 U.S.C. § 2605(e) does not, contrary to plaintiffs' assertion, mandate the conclusion that the regional EPA employees undertook duties with regard to PCB cleanup beyond those outlined in TSCA or the EPA's regulations.

The PCB regulations did not mandate a particularized response by the EPA in 1981 or 1984, when it learned of test results demonstrating the presence on the Carter site of PCBs in excess of 50 ppm. We accept plaintiffs' contention that the EPA recognizes PCB levels of 50 ppm to be excessive.[6] But that does not mean that regional EPA officials have no discretion in formulating an appropriate response upon receiving evidence that a site within their jurisdiction has been tested to contain PCBs in excess of 50 ppm. Even now, the regulations do not mandate a particularized response. *See* 40 C.F.R. § 761.135 (1990).

The EPA statement plaintiffs cite in an effort to support their argument that the EPA was committed to cleanup all PCB spills within forty-eight hours is misleading. The EPA was referring to a final rule promulgated in 1982 as 40 C.F.R. § 761.30(a)(1)(iii) (1983) regarding a condition on the authorized use of non-totally enclosed PCB activities. *See* 40 C.F.R. § 761.30(a)(1)(x) (1990). This provision, rather than committing the EPA to engage in an immediate cleanup of every site where exposure to PCB levels of more than 50 ppm is discovered, simply instructs those using electrical transformers containing dielectric fluids with PCBs as authorized in the regulations to engage in cleanup efforts within forty-eight hours of a spill or leak or be subject to a possible EPA citation. *See* Use in Electrical Equipment, 47 Fed.Reg. at 37,353–54.

The Manual and the Draft Order, which were not promulgated as EPA regulations, likewise do not mandate a specific EPA response to evidence like that presented to the EPA in 1981 and 1984. Plaintiffs have not alleged that the 1981 and 1984 MDNR inspections were flawed or that the EPA could not rely on the evidence derived therefrom in making its decision. The Manual's inspection procedures, therefore, are of little assistance in this case. The Draft Order's instruction that "[a]ll improperly disposed PCBs shall be cleaned up" does not provide the specific and mandatory response plaintiffs now demand of the EPA.

Therefore, we conclude that the statutory and regulatory scheme relevant to the EPA's conduct in this case granted the regional EPA employees discretion to formulate a response to evidence of PCB contamination at a particular spill site within their jurisdiction.[7]

---

**6.** We agree with plaintiffs that the EPA believes 50 ppm is an excessive level of PCBs. As noted, the EPA has used 50 ppm as the benchmark for its disposal methods since 1979, and the EPA's current spill cleanup policy refers to 50 ppm as too much. Also, Ralph Dollopf, the environmental engineer who spearheaded the EPA's 1986 cleanup of the Carter site, labeled 50 ppm as the EPA's "action level" or "the level of PCBs in the soil in that area that we considered too high" during his deposition testimony. By accepting 50 ppm as a relevant quantity in this case, however, we express no opinion as to whether a higher or lower level of PCBs could or could not be significant in some other situation. *See Environmental Defense Fund,* 636 F.2d at 1279–84.

**7.** In addition to the TSCA statutory and regulatory scheme, we have reviewed the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.,* and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.,* to determine whether a specific type of EPA response was required under the facts of this case. TSCA, RCRA, and CERCLA collectively encompass the comprehensive scheme authorizing federal control over hazardous materials.

RCRA grants the EPA discretionary authority, upon receiving evidence of a statutory or regulatory violation, to determine if a handler of solid wastes has violated federal disposal procedures and/or poses a risk to the public. The EPA is then permitted to determine the appropriate response to a violator. *See* 42 U.S.C. §§ 6928(a)(1), 6934(a), and 6973(a). Only if the EPA determines that an imminent hazard exists is it now required to notify local government agencies of the hazard. *See* 42 U.S.C. § 6973(c).

Through Executive Order No. 12316, the President delegated to the EPA the authority CERCLA gave him in 42 U.S.C. § 9604(a)(1) to remove hazardous waste and to protect public health and/or the environment in a manner consistent with the "national contingency plan." *See* 46 Fed.Reg. 42,237 (1981). The national contingency plan may be found at National Oil

## C.

Having concluded that TSCA and the regulations promulgated thereunder accord regional EPA employees discretion to determine an appropriate response to evidence of a PCB spill, we must determine whether that discretion, as exercised with regard to the discovery of PCB levels at the Carter site in 1981 and 1984 was the kind Congress intended would be shielded from liability under the TSCA. *See Berkovitz,* 486 U.S. at 536–37, 108 S.Ct. at 1958–59. That is, we must decide "if the action challenged in the case involves the permissible exercise of policy judgment." *Id.* at 537, 108 S.Ct. at 1959.

■ Congress intended that the discretionary function exception would " 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' " *Id.* at 536–37, 108 S.Ct. at 1959 (quoting *United States v. Varig Airlines,* 467 U.S. 797, 814, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984)). The government is immune from damages resulting from an alleged negligent failure to act if the inaction challenged is an exercise of that kind of discretion. *See Graves v. United States,* 872 F.2d 133, 137 (6th Cir.1989) (citing *Myslakowski v. United States,* 806 F.2d 94, 97 (6th Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987));

and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300.1, *et seq.* (1990). Nothing in CERCLA or the regulations promulgated thereunder affects our assessment of the EPA's authorized discretion in this case.

8. MDNR Letter from Michael Moore, Region III Director, to Gordon E. Guyer, Director (June 17, 1986).

9. In his affidavit, Patulski stated:
While the inspection report indicated that PCBs were on the site, the information in the report was inconclusive on whether there were enforceable violations of TSCA since there were no regulated equipment or regulated sources reported at the site.
I concluded that additional sampling was required at the site as well as an investigation to determine the source(s) for the PCBs and the approximate date(s) the contamination had occurred.

*Dube v. Pittsburgh Corning,* 870 F.2d 790, 796 (1st Cir.1989); *In re Ohio River Disaster Litigation,* 862 F.2d 1237 (6th Cir. 1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 59, 107 L.Ed.2d 27 (1989).

■ EPA has explained that its inaction in 1981 was based on a judgment that it lacked sufficient evidence to cite Carter for a TSCA violation since the MDNR inspector could not establish that the PCB release on the Carter site had occurred after 1979, the effective date of TSCA. Environmental Protection Agency officials told the MDNR inspector that, since the tests on the transformers at the Carter site revealed no detectable PCBs present, they would not act.[8]

The EPA said its inaction in 1984 was based on a determination that further study, rather than immediate action, was appropriate. Daniel Patulski made this decision based on the evidence presented him by the MDNR inspector who had visited the Carter site and reviewed Carter's records.[9]

The delay in the EPA's reinspection between 1984 and 1986 was based on its greater concern for the health and environmental risks associated with waste oil haulers. Patulski decided to go after the haulers first, and then return to the Carter site, with winter weather delaying reinspection until the spring of 1986.[10]

10. Patulski stated:
My request for reinspection did not establish the Carter site as a priority. Rather, based upon the findings of an EPA investigation at CAM–OR Refinery, I requested that MDNR give priority to the inspection of waste-oil haulers. I specifically identified ABC Waste Oil, Stoddard and Sons, Inland Water Pollution Control Systems, the Rouge Plant of the Ford Motor Company, Carter Industrials, A–1 Disposal, and Usher Oil Service for inspection. Additionally; I requested that MDNR select, at its discretion, several utilities which had not been inspected and several sites as spill follow-ups.
And:
In late 1985 or early 1986, I again discussed the reinspection of the Carter site with MDNR. We both agreed that the snow cover at the site prevented effective sampling and inspection. Accordingly, we agreed to delay the reinspection until the Spring of the year.

We think these discretionary decisions, based upon "judgment calls" concerning the sufficiency of evidence of violations of applicable regulations, the allocation of limited agency resources, and determinations about priorities of serious threat to public health, are the very "public policy" discretionary judgments Congress intended to shield from liability under section 2680(a). However much we personally may wish to see immediate cleanup of every site exposed to PCBs or any other toxin, we are not in a position to second guess the response of the EPA administrators who must balance the environmental, economic, and social implications of each enforcement decision, knowing the limits of resources available to them. We, thus, conclude that the EPA's decisions regarding the Carter site are within the protection provided by the discretionary function exception.

### D.

Based on our reading of the statutory and regulatory scheme governing the EPA's duties toward PCB spills, and because of the nature of the decisions the EPA made in 1981, 1984, and between 1984 and 1986 regarding the Carter site, we hold that the discretionary function exception of 28 U.S.C. § 2680(a) bars plaintiffs' suit against the government in this case.

Our holding comports with the post-*Berkovitz* decision of the District of Columbia Circuit in *Wells v. United States*, 851 F.2d 1471 (D.C.Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989), an environmental contamination case, in which the EPA's alleged negligence in failing to take immediate cleanup measures was held to be nonactionable since "[the Administrator's] decision to order further study was based on economic, social and political policy considerations [within the discretionary function exception], and not

solely on scientific considerations as plaintiffs claim." *Id.* at 1478.[11]

### III.

For the foregoing reasons, the district court's judgment dismissing the plaintiffs' complaint is AFFIRMED.

GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge, dissenting.

This case involves the rights of common citizens to hold a government agency liable for its apparent indifference to their plight. It was in 1981 that the Environmental Protection Agency first learned that dangerously high levels of PCBs were found at Carter Industrials, not far from the residential homes of the Willie Mae Lockett and her neighbors. But, the EPA failed to respond to this initial report of an environmental peril in the midst of Detroit.

Afterward, the pollution at Carter Industrials continued, unabated, for five years. From the Carter scrapyard, trucks and cars tracked the PCB stained ground, carrying it down the streets; winds carried the toxins through the air, sewers under the surface of the ground. On the streets where children played, the sidewalks where residents walked, the yards where gardens were planted—all were drenched with toxins. By 1986, the PCB levels in the backyards of family homes near the scrapyard reached 1,800 parts per million, and one public alleyway topped 96,000 parts per million.

Consequently, the men, women, and children who lived near Carter Industrials were exposed to the toxic poisons, day in and day out, for years. Today, they face the specter of crippling illness and death. They have brought this suit against the EPA, seeking justice. This, they shall not

---

11. Our holding is also consistent with two noteworthy pre-*Berkovitz* decisions involving the EPA. In *Cisco v. United States,* 768 F.2d 788 (7th Cir.1985), neighbors to a residential landfill sued the government under FTCA for exposure to tetrachlorodibenzo-paradioxin, alleging that the EPA was negligent in failing to warn them about the toxin. In *Bacon v. United States,* 810 F.2d 827 (8th Cir.1987), road repairmen working for the Department of Housing and Urban Development ("HUD") sued the government under FTCA for their exposure to dioxins, alleging that HUD and the EPA, which had conducted dioxin tests in the area near the workers' exposure, negligently failed to warn them of any hazard. Both cases resulted in dismissals based on the discretionary function exception. *Cisco,* 768 F.2d at 790; *Bacon,* 810 F.2d at 830.

receive; their case never to be heard by a jury of their peers; their day in court never to begin. The case ends here for summary judgment has been rendered for the EPA.

In my view, the adjudication of the summary judgment motion should have been only a stopping point in the progress of the case towards trial and judgment, not the point where the case was stopped. Hence, I dissent. My opposition to the decision to dismiss the case is not based merely on a felt sense of injustice, ethereal and without a legal basis. On the contrary, my position naturally follows from the law governing this case.

The legal question before this Court is whether this suit could be brought under the FTCA, 28 U.S.C. § 1346(b), which generally authorizes suits against the United States "for injury or loss of property or death caused by the negligent or wrongful act or omission of any employee of the Government ..." The EPA contends its conduct falls within an exception to the TSCA, and hence is barred.[1] Specifically, the EPA asserts that protecting a populat-

ed neighborhood from the pollution at Carter Industrials was a "matter of choice" for the agency.[2] The EPA argues that it made this choice on the basis of social, economic and policy judgments and is shielded from liability by the discretionary function exception of the Federal Tort Claims Act.[3] The district court granted this motion, and then this court has upheld the decision. I disagree.

First, the EPA has not provided evidence that its conduct is completely shielded by the discretionary exception. The EPA has not brought forth any of the documents that are ordinarily produced in the course of public policy decisions to explain the agency's failure to prosecute Carter Industrials in 1981.[4] It has produced no notes of policy meetings, no reports, no memorandums, no affidavits, no depositions: not an iota of information on who made the decision or why. As a consequence, this court cannot determine whether the EPA's inaction in 1981 stemmed from negligence or the kind of policy judgment shielded by the discretionary function exception to the Fed-

---

1. The discretionary exception provides that no liability shall lie for

   [a]ny claim ... based upon the exercise or performance of the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

   28 U.S.C. § 2680

2. The Supreme Court set forth these principles to guide the determination of whether the government's actions were a "matter of choice." *Berkovitz v. United States*, 486 U.S. 531 at 536, 108 S.Ct. 1954 at 1958. (1988).

   In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice. See *Dalehite v. United States*, 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953) (stating that the exception protects "the discretion of the executive or the administrator to act according to one's judgment of the best court"). Thus, the discretionary function exception will not apply when a federal, statute, regulation, or policy specifically prescribes a course of action for an employee to follow.

3. The Supreme Court sets forth these guides for determining whether the judgment was the kind that the discretionary exception was intended to shield:

   "[A]ssuming the challenged conduct involves an element of judgment, a court must determine whether the judgment is of the kind that the discretionary exception was designed to shield. The basis for the discretionary function exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of tort ..."

   *Berkovitz v. United States*, 486 U.S. 531, 536–537, 108 S.Ct. 1954, 1959, 100 L.Ed.2d 531 (1988).

4. In fact, the curious absence of documentation of EPA's conduct in 1981 stands starkly apart from EPA's documentation of its other decisions regarding Carter Industrials in 1984 and 1986. In these instances, the EPA has produced evidence of where and how the decisions were made through reports, depositions, and affidavits. Nor do these later reports note the existence of a policy decision underlying the EPA's failure to prosecute environmental violations at Carter Industrials in 1981. *See* EPA Potential Hazardous Waste Site Preliminary Assessment, July 7, 1984; Deposition of Ralph Dollhopf, EPA on-scene Coordinator; Affidavit of Daniel E. Patulski, EPA officer.

eral Torts Claim Act.[5] Any conclusion that this court has made is mere conjecture.

Second, even assuming arguendo, that there was a decision by the EPA, it does not necessarily follow that protecting a populated neighborhood from the pollution at Carter Industrials was a "matter of choice." [6] Indeed, the relevant regulations do not permit such a conclusion for the EPA was required to act once it knew that significant dispersions of PCBs had been detected at Carter Industrials in 1981:

> [The] EPA will seek stringent penalties in any situation in which significant dispersion of PCBs occurs due to a violation.

44 Fed.Reg. 31,538 (1979).

Therefore, this court should not assume that enforcing the law was a "matter of choice" when the relevant regulations lead to the opposite conclusion.[7]

Thus, the facts and the law lead to one inexorable conclusion: this court cannot grant summary judgment for the EPA on the basis of the discretionary function exception. First, the EPA has not shown that its initial inaction was based on a decision grounded in the kind of policy considerations that are shielded by the discretionary function exception. Second, the EPA has not proven that it was a "matter of choice" to enforce environmental laws mandated by Congress and commanded by the agency's own regulations. Therefore, this court should have denied summary judgment, and allowed Willie Mae Lockett and her neighbors to have their day in court.

---

**5.** This court's determination of this issue is not supported by the record. For example, this court states that an EPA officer, Daniel Patulski "determined that an enforcement action was not warranted in 1981 or 1984," a direct quotation from the lower court's decision in *Lockett v. United States*, 714 F.Supp. 848, 852 (E.D.Mich. 1989). Nonetheless, Patulski did not become an EPA officer until 1985, and has no recollection of a 1981 EPA determination on Carter Industrials. Nor does any other EPA officer recall such a decision. *See* Affidavit of Daniel E. Patulski; Deposition of Ralph Dollhopf, EPA on-scene Coordinator.

**6.** *See generally Graves v. U.S.*, 872 F.2d 133 (6th Cir.1989) ("Discretionary decisions are not sim-

ply any decision that a government agency or employee makes.")

**7.** At the time that the events in this case took place, Congress made it very clear that it never intended to grant to the EPA unbridled discretion in deciding whether or not to enforce its laws. In fact, in 1981, Congress was in the midst of conducting investigations into the EPA's failure to prosecute violations of the environmental laws. Ultimately, these inquiries led to the resignations of EPA's top-ranking officials. *See generally* Mintz, *Symposium on Waste Management Law and Policy: Failure of the Current Waste Management Policy: Agencies, Congress and Regulatory Enforcement, A Review of EPA's Hazardous Waste Enforcement Effort of 1970–1987,* 18 ENVTL.L.REV. 684 (1988).